FILED

MAR 19 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **I N D I C T M E N T** |
| | ) | |
| Plaintiff, | ) | **1:26 CR 00132** |
| | ) | |
| v. | ) | CASE NO._____ |
| | ) | Title 18, United States Code, |
| JIMMY LEE MCFADDEN, | ) | Sections 1001(a)(2), 1349, |
| | ) | and 1503 |
| Defendant. | ) | |

**JUDGE CALABRESE**

GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise specified:

1.     Defendant JIMMY LEE MCFADDEN resided in Kingstree, South Carolina. Defendant worked in the trucking industry.

2.     Defendant owned J Mac's Express LLC ("J Mac's Express"), a trucking business located in Cades, South Carolina, which operated semi-trailer trucks for transporting products for clients.

3.     Person 1 and Person 2 were truck drivers employed by J Mac's Express.

4.     Terrence Anderson (charged separately) worked in the polymer industry, buying and reselling polymers, including polyethylene.

5.     Coral Polymers was a corporation owned and operated by Anderson in Parkland, Florida, for the purpose of buying and reselling polymers.

6.     Victim Seller 8 was headquartered in Avon Lake, Ohio. Victim Seller 8 was involved in the sale of polymers, including polyethylene, throughout the world. Victim Seller 8 maintained its email servers in the Northern District of Ohio, Eastern Division.

7. Victim Logistics Company 2 was a logistics company located in Streator, Illinois. Victim Logistics Company 2 repackaged product received by way of railcar into gaylord boxes, which were large boxes on pallets that were used to ship items in bulk, for the purpose of enabling the product to be loaded and transported by way of a semi-trailer truck.

COUNT 1
(Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349)

The Grand Jury charges:

8. The factual allegations contained in paragraphs 1 through 7 of this Indictment are incorporated by reference as if stated fully herein.

The Conspiracy and Scheme to Defraud

9. From in or around 2013 to in or around July 2021, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant JIMMY LEE MCFADDEN, Anderson, Person 1, Person 2, and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to commit federal fraud offenses, that is: to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

The Objects and Purposes of the Conspiracy and Scheme

10. The objects and purposes of the conspiracy and scheme included, but were not limited to, the following: for the conspirators to unjustly enrich themselves by (a) obtaining

2

property and services, including shipments of polymer chemicals and logistics services for those shipments, by false pretenses, (b) selling the fraudulently obtained chemicals, (c) sharing in the proceeds, and (d) concealing the conspiracy and scheme.

<u>Manner and Means of the Conspiracy and Scheme</u>

11. It was part of the conspiracy and scheme that:

a. Anderson posed as fictional employees of large, well-known corporations by creating and using email addresses that were similar to those of corporations known to purchase polymers (the "Fraudulent Addresses"), using email signatures falsely claiming to be employed by those corporations, and using the known logos and purported letterhead of those corporations.

b. Anderson used the Fraudulent Addresses to contact victim sellers of polymers to agree to purchase large quantities of polymers through interstate wire transmissions, to be delivered by railcars to victim logistics companies at particular locations (the "Stolen Shipments"). Anderson, through Defendant, and individuals acting at Anderson's and Defendant's direction (the "Drivers"), including Person 1 and Person 2, received Stolen Shipments.

c. Anderson used the Fraudulent Addresses to contact victim logistics companies to arrange for those victims to provide logistics services in connection with Stolen Shipments, including to unload bulk polyethylene pellets from railcars, repackage the polyethylene in gaylord boxes, temporarily store the polyethylene, and load the repackaged polyethene from the Stolen Shipments into the trailers of semi-trailer trucks that Defendant caused the Drivers to provide.

3

d. Defendant arranged with Anderson and others to have the Drivers, driving semi-trailer trucks controlled by Defendant and J Mac's Express, pick up the Stolen Shipments, including from victim logistics companies.

e. Defendant and Anderson directed the Drivers to conceal their identities and the identity of J Mac's Express when picking up the Stolen Shipments, including by directing the Drivers to ensure that license plates of the trucks being used were removed or covered and to use false names for both J Mac's Express and the Driver.

f. From time to time, Anderson also provided Defendant a copy of a counterfeit driver's license, using a false name for the driver and false biographical information, for Defendant to provide to the Driver, or provided the same directly to the Driver, generally when a victim company requested identification or if Anderson expected that might occur.

g. Anderson, using the name of his company, Coral Polymers, found third-party buyers who were unaware of the origin of the Stolen Shipments, and arranged to sell the Stolen Shipments to the buyers for substantial sums of money.

h. Defendant arranged with Anderson and others to have the Drivers, driving semi-trailer trucks controlled by Defendant and J Mac's Express, to deliver the Stolen Shipments to buyers, using the true names of J Mac's Express and the Drivers, in exchange for fees paid to Defendant or J Mac's Express, reflecting the additional risk that Defendant and the Drivers bore in handling Stolen Shipments.

i. Defendant and Anderson directed the Drivers to conceal the true plans for the destination of the Stolen Shipments when picking up the Stolen Shipments.

4

j.       Defendant and Anderson directed the Drivers to conceal packing slips and other information about the true origin of the Stolen Shipments when delivering the Stolen Shipments to the buyers.

k.       Contrary to his representations to victim sellers, Anderson never intended to pay for the Stolen Shipments, and stopped responding to the victim sellers and the victim logistics companies after obtaining the Stolen Shipments, or substantial portions of the Stolen Shipments.  Neither Anderson nor J Mac's Express ever paid for the Stolen Shipments or for the logistics services received.

l.       When investigators from law enforcement agencies, including the Federal Bureau of Investigation, learned that J Mac Express had been involved in moving the Stolen Shipments and asked Defendant about the shipments, Defendant lied to conceal the conspiracy and his and the Drivers' participation in the conspiracy.

<u>Acts in Furtherance of the Conspiracy and Scheme</u>

12.     The acts caused by Defendant and his co-conspirators in furtherance of the conspiracy and scheme, in the Northern District of Ohio, Eastern Division, and elsewhere, included, but were not limited to, the following:

13.     On or about June 27, 2013, Anderson, using a Fraudulent Account, contacted Victim Seller 1 and submitted a purchase order for polyethylene worth approximately $161,325.

14.     In or around July 2013, Anderson, using a Fraudulent Account, contacted Victim Seller 2 to begin to arrange for purported purchases of polyethylene worth approximately $577,094.

15.     In or around September 2013, Defendant, Anderson, and Person 1 exchanged text messages and emails to plan for Person 1 to pick up a Stolen Shipment from Victim Seller 2 in or around Houston, Texas.  Anderson repeatedly emphasized to Person 1 that the license plates on

the truck should be removed or covered, and that he should not use his real name. Anderson stated that Person 1 should "take no chances" on the license plate being seen. Defendant and Anderson also emphasized to Person 1 that the true destination for the Stolen Shipment should not appear on any paperwork when picking up the Stolen Shipment.

16. In or around October 2013, Defendant, Anderson, and Person 1 exchanged text messages and emails to plan for Person 1 to pick up a second Stolen Shipment from Victim Seller 2 in or around Houston, Texas. When Person 1 informed Anderson that he was getting close to the pick-up point, Anderson instructed Person 1, "Same as before. No plates or names."

17. In or around November 2014, Anderson, using a Fraudulent Account, contacted Victim Seller 3 and submitted a purchase order for polyethylene worth approximately $148,200.

18. In or around December 2014, Anderson, using a Fraudulent Account, contacted a victim seller and arranged to purchase at least approximately 17 semi-trailer loads of polyethylene, worth approximately $556,920.

19. On or about January 29, 2015, Defendant, Anderson, and Person 1 exchanged text messages to plan for Person 1 to pick up a Stolen Shipment in or around Houston, Texas. Anderson stated to Defendant, "Still gotta be a plain truck & trailer just like last time." Defendant asked how many loads there would be. Anderson responded, "17 loads total."

20. On or about February 3, 2015, Anderson and Person 1 exchanged emails and text messages regarding the plans for Person 1 to pick up a Stolen Shipment in or around Houston, Texas. Anderson instructed Person 1 that they would do the first load on the afternoon of February 3, 2015, and "then at 9AM and 1PM daily until done." Anderson stated to Person 1, "Same as last time. Pull your license plates and no names anywhere." Anderson said Person 1 would have to show a driver's license, and asked Person 1 to email a picture of Person 1's

6

license. Anderson received that picture and created a counterfeit driver's license, using a false name, and emailed it back to Person 1. Anderson then sent Person 1 a text message stating, "Study it so you know your name."

21. On or about February 4, 2015, Anderson exchanged text messages with Person 1 regarding the Stolen Shipment that Person 1 was picking up. Anderson asked Person 1, "Did security give you any trouble?" Person 1 responded, "No," and added, "Not thus far lol." Anderson responded, "If they didn't today, probably smooth sailing from here."

22. On or about February 13, 2015, Anderson exchanged text messages with Person 1 regarding the Stolen Shipment that Person 1 was picking up. Person 1 asked Anderson to confirm that there would be two loads on the following Monday, making a total of 18 loads, and Anderson confirmed. Anderson added, "After today there will be one and a half loads of material left. I am fine with leaving the half load if you just want to run one [load] on Monday and get out of town. If you wanna run the second load on Mon[day] that's fine too. I'll pay for the additional load. Either way is fine. Your call." Person 1 confirmed that Defendant decided to do "both" loads on Monday, February 16, 2015. Anderson responded, "Works for me!!"

23. On or about February 23, 2016, Defendant and Anderson exchanged text messages and emails to plan for a driver to pick up a Stolen Shipment. Anderson said he had work for Defendant and asked, "Got somebody as good as [Person 1]?" Defendant responded that he did, and sent Anderson an email with a scanned copy of Person 2's South Carolina driver's license.

24. On or about March 1, 2016, Defendant and Anderson exchanged text messages. Defendant asked if there was "[a]ny word yet." Anderson responded, "Not yet. I'll know

7

shortly cause I'm gonna fish or cut bait." Anderson later stated, "Cut bait bring him home. I'll get another set up very soon."

25. In or around April 2016, Anderson, using a Fraudulent Account, contacted Victim Seller 4 and arranged for purported purchases of polyethylene worth approximately $384,000.

26. On or about April 21, 2016, Anderson sent Defendant multiple emails. One email had the subject line "DL and pick up order" and two attachments. One attachment was a scan of a purported South Carolina driver's license with the photograph of Person 2 and a false name and other biographical information. The other attachment was titled "Pickup Order," on the letterhead of a major manufacturer Anderson had been impersonating with a Fraudulent Account, with Victim Seller 4's information, and false information regarding the destination of the Stolen Shipment. Another email with the subject line "BOL's for the Shelbyville deliveries" had multiple attachments, each titled "Bill of Lading," and each listing Coral Polymers as the shipper and the true buyer that Anderson had arranged as the ship-to destination.

27. On or about April 25, 2016, Defendant, Anderson, and Person 2 exchanged text messages to plan for Person 2 to pick up the Victim Seller 4 Stolen Shipment in or around Jeffersonville, Indiana. Person 2 asked Anderson for "the destination for the load to tell them [the false destination]." Anderson responded with an address in Louisville, Kentucky. In truth and in fact, Anderson was arranging for Person 2 to deliver the Stolen Shipment to a location in or around Shelbyville, Kentucky. Anderson sent identical messages to Defendant and Person 2 about delivering the Stolen Shipment to the true buyers, stating, "Don't let them get any packing slips!! They can't know where this stuff came from."

28. In or around March 2017, Anderson, using a Fraudulent Account, contacted Victim Seller 5 and submitted purchase orders for polyethylene worth approximately $478,800.

8

29.     In or around April 2017, Anderson, using a Fraudulent Account, contacted Victim Seller 6 and submitted purchase orders for two railcars of polyethylene, worth approximately $281,525.

30.     On or about April 20, 2017, Defendant and Anderson exchanged text messages to plan for Person 2 to pick up Stolen Shipments in the area of Charlotte, North Carolina. Anderson instructed Defendant, "Remember no markings on truck. No license plates, driver cannot show his license. I'll send you a dummy so he can use a copy," and added, "if they ask." Defendant confirmed, and Anderson stated, "Same as last time," and explained, "I'll email you the license. Print it out and give it to him. He should say he lost his wallet but only if they ask for it. I don't think they will."

31.     On or about April 23, 2017, Anderson sent an email to Defendant with the subject line "DL" and an attachment. The attachment was a scan of a purported South Carolina driver's license with the photograph of Person 2 and a false name and other biographical information.

32.     Between on or about April 23, 2017 and April 25, 2017, Anderson sent emails to Defendant attaching documents titled "Release Order," bearing the emblem of a major manufacturer Anderson had been impersonating with a Fraudulent Account, concerning Stolen Shipments that had been shipped by rail from a company in or around Houston, Texas, to be picked up in the area of Charlotte, North Carolina.

33.     On or about April 24, 2017, Defendant and Anderson exchanged text messages about the Stolen Shipments Person 2 was picking up in the area of Charlotte, North Carolina, and plans for Person 2 to deliver truck loads to various locations in South Carolina, North Carolina, and New Jersey. Defendant stated that Person 2 would make deliveries in North Carolina and South Carolina "in between waiting on the other driver to get back," adding that the "plan is to

9

do 15 plus load[s] by Friday and finish up Monday and Tues[day,] unless [the logistics company facility where the Stolen Shipment was being stored is] open on the weekend."

34.     On or about May 11, 2017, Defendant and Anderson exchanged text messages about additional Stolen Shipments Person 2 would be picking up in the area of Charlotte, North Carolina. Anderson stated that the "next 5 will be early next," to be delivered to the same locations in North Carolina and South Carolina.

35.     On or about May 15, 2017, Anderson sent Defendant an email with the subject line "Pick up appts and releases" and a message that included dates, times, and release codes for Stolen Shipments to be picked up in the following days.

36.     Between in or around September 2018 and October 2018, Anderson, using a Fraudulent Account, impersonating a major international manufacturer, contacted Victim Seller 7 and submitted purchase orders for polyethylene worth approximately $659,448.

37.     On or about October 25, 2018, Defendant and Anderson exchanged text messages to plan for J Mac's Express to pick up Stolen Shipments from Victim Seller 7 in the area of Spruce Pine, North Carolina. Anderson stated, "Here's the plan," and explained, "Same setup. One driver does pickups. No markings or license plate on truck." Anderson added, "Only difference is we can't cram all the loads into a week. They gotta stay spread out."

38.     On or about October 31, 2018, Defendant and Anderson exchanged text messages to plan for J Mac's Express to pick up Stolen Shipments from Victim Seller 7 in the area of Spruce Pine, North Carolina. Anderson indicated a driver's license should not be needed this time, and added, "If they ask, he should say his wallet was stolen. Then he should let us know and I'll talk the warehouse through it." Anderson reminded Defendant, "Remember no license plates or identifying logos on the truck or the driver." Anderson also instructed Defendant, "The

warehouse will provide a BOL [bill of lading] but throw those away after pickup. I'll send you BOL's for deliveries." Regarding bills of lading Anderson was preparing, Anderson explained, "These are your deliveries. The PU [pick-up] people should never see these."

39. On or about October 31, 2018, Anderson sent Defendant a number of emails. One email had an attachment that was a document bearing the name and logo of the manufacturer Anderson was impersonating, and titled, "[Manufacturer] Transport Order." Victim Seller 7 was listed next to "Ordered from," and Victim Logistics Company 1 was listed next to "Ship to." Another email with the subject line "BOL's" had 15 attachments, each a bill of lading listing "Coral Polymers" as the shipper, and listing the true buyers Anderson had arranged as the recipients of the shipments.

40. In or around November 2018, Anderson, using a Fraudulent Account, impersonating a major international manufacturer, contacted Victim Logistics Company 1 and arranged for Victim Logistics Company 1 to provide logistics services worth approximately $37,070.19, in connection with the Victim Seller 7 Stolen Shipments.

41. On or about January 4, 2019, Defendant told the Federal Bureau of Investigation in a telephonic interview that he was paid in cash from Coral Polymers, and broadly denied knowledge that his work with Anderson was improper.

42. Between in or around October 2019 and November 2019, Anderson, using a Fraudulent Account, impersonating a major manufacturer of consumer goods, using an email signature claiming the title "VP Strategic Sourcing" for the "Hair Care Division" of the manufacturer, contacted Victim Seller 8 and submitted purchase orders for polyethylene worth approximately $1,608,000 (at prices of between $0.66 and $0.69 per pound), to be delivered to Victim Logistics Company 2 in or around Streator, Illinois.

11

43. On or about October 2, 2019, Anderson sent an email to a sales representative for Victim Seller 8 attaching a purchase order for 800,000 pounds of polyethylene (calculated as four railcars at approximately 200,000 pounds of polyethylene per railcar). Anderson stated that he would send an order for additional railcars.

44. On or about October 21, 2019, Anderson sent an email to a sales representative for Victim Seller 8, attaching a purchase order for 400,000 pounds of polyethylene.

45. On or about November 8, 2019, Anderson sent an email to a sales representative for Victim Seller 8, stating that he would order additional polyethylene as follows: 2 railcars in December 2019, 4 railcars in January 2020, and 3 railcars in February 2020.

46. On or about November 12, 2019, Anderson sent an email to a sales representative for Victim Seller 8, attaching a purchase order for 400,000 pounds of polyethylene.

47. On or about November 17, 2019, Anderson sent an email to a sales representative for Victim Seller 8, attaching a purchase order for 800,000 pounds of polyethylene.

48. In or around November 2019, Anderson, using a Fraudulent Account, impersonating a major manufacturer of consumer goods, contacted Victim Logistics Company 2 and arranged for Victim Logistics Company 2 to provide logistics services worth approximately $50,346.42, in connection with the Victim Seller 8 Stolen Shipments delivered between November 2019 and January 2020.

49. On or about November 21, 2019, Defendant and Anderson exchanged text messages to plan for Person 2 to pick up some of the Victim 8 Stolen Shipments from Victim Logistics Company 2 in or around Streator, Illinois. Anderson instructed, "tell him to take label off," and added that was "a must." Anderson later stated, "WTF [J Mac's Express] is listed on their BOL?? How did that happen?"

50. On or about December 23, 2019, Anderson sent Defendant an email, attaching four bills of lading listing "Coral Polymers" as the shipper, and listing the true buyers Anderson had arranged as the recipients of the shipments.

51. On or about December 26, 2019, Defendant and Anderson exchanged text messages regarding the plans for Person 2 to pick up some of the Victim 8 Stolen Shipments and deliver them to the true buyers. Anderson stated, "Make sure he takes the labels off for the Chicago loads!! Critical!!"

52. On or about December 30, 2019, Anderson, using a Fraudulent Account, sent an email to Victim Logistics Company 2 stating that he would return to the United States on January 14, 2020, referring to a purported trip to China, and that, "later that week," he would visit Victim Logistics Company 2 to introduce himself "and drop off a check."

53. Between on or about January 16, 2020 and January 22, 2020, Anderson, using a Fraudulent Account, exchanged emails with a sales representative for Victim Seller 8. On or about January 16, 2020, Anderson falsely stated that he "came down with the flu and wasn't allowed to leave [China]" in order to return to the United States, but would soon be back. On or about January 21, 2020, the sales representative followed up, saying she hoped Anderson was "feeling better," asking if he had "made it back to the US," and stating that Victim Seller 8 management "does not want to hold your material considering your extenuating circumstances, so your 4 R/C's [the final four railcars from Anderson's November 17, 2019, fraudulent purchase order] were released on credit hold in good faith," and informing Anderson the price had increased to $0.70 per pound. Anderson responded on or about January 22, 2020, stating, "Unfortunately, I've been diagnosed with the Coronavirus," referring to the SARS-CoV-2 virus that caused COVID-19. Anderson continued, saying he had a "mild case" but was "stuck [in

13

China] until cleared medically," and saying he would wire the money the following week. In truth and in fact, Anderson had not traveled to China and had not contracted the SARS-CoV-2 virus.

54. On or about January 24, 2020, Anderson, using a Fraudulent Account, sent an email to Victim Logistics Company 2 in response to requests for payment of a then-pending balance due of $33,453.80, stating, "I got stuck in China due to this virus outbreak."

55. Between in or around November 2019 and January 2020, Anderson, through J Mac's Express, received and sold six railcars of Stolen Shipments, or approximately half of the approximately $1,608,000 in polyethylene Anderson had ordered from Victim Seller 8, before Victim Seller 8 realized Anderson was not paying for the shipments and that Anderson was impersonating the company he purported to represent.

56. On or about November 10, 2020, Defendant sent Anderson a text message inquiring about whether Anderson had any additional Stolen Shipments that needed to be transported.

57. On or about December 17, 2020, Defendant sent Anderson a text message inquiring about whether Anderson had any additional Stolen Shipments that needed to be transported.

58. On or about March 30, 2021, Defendant sent Anderson a text message inquiring about whether Anderson had any additional Stolen Shipments that needed to be transported.

59. On or about May 12, 2021, Defendant spoke with Anderson on the telephone and discussed using trucks without GPS systems to overcome tag readers for Stolen Shipments.

60. On or about July 22, 2021, Defendant attempted to conceal the conspiracy and scheme in an interview with the Federal Bureau of Investigation, including making the following false statements:

a. Defendant stated that he last spoke to Anderson near the end of 2020 or the beginning of 2021.

b. Defendant stated that it had been three years since the last time he worked with Anderson.

c. Defendant stated that his work for Anderson used a "blind shipment" method, the purpose of which was to avoid theft of the freight and for customers to protect supplier information from competitors.

d. Defendant stated that, over the course of his relationship with Anderson, he had worked only three jobs with Anderson.

e. Defendant stated that, for one job, Anderson left behind cash for the driver to pick up at the destination in order to pay him.

f. Defendant stated that he had not seen certain fake driver's licenses shown to him.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
(Obstruction of Justice, 18 U.S.C. § 1503)

The Grand Jury further charges:

61. The factual allegations contained in Count 1 of this Indictment are incorporated by reference as if stated fully herein.

62. On or about July 22, 2021, in the Northern District of Ohio, Eastern Division, the District of South Carolina, and elsewhere, Defendant JIMMY LEE MCFADDEN did corruptly

15

influence, obstruct, and impede, and endeavor to influence, obstruct, and impede the due administration of justice in a pending federal Grand Jury investigation in the Northern District of Ohio, by providing materially false information to investigators from the Federal Bureau of Investigation.

All in violation of Title 18, United States Code, Section 1503.

### COUNTS 3-5
### (False Statements, 18 U.S.C. § 1001(a)(2))

The Grand Jury further charges:

63. The factual allegations contained in Count 1 of this Indictment are incorporated by reference as if stated fully herein

64. On or about September 20, 2021, in the Northern District of Ohio, Eastern Division, the District of South Carolina, and elsewhere, Defendant JIMMY LEE MCFADDEN did willfully and knowingly make the following materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, by lying to the Federal Bureau of Investigation in the following way, concerning a Grand Jury investigation in the Northern District of Ohio. The statements and representations were false because, as Defendant then and there knew, the following was the truth.

| Count | False Statement | Truth Known to Defendant |
|---|---|---|
| 3 | Defendant did not recall Anderson sending Defendant a copy of a falsified driver's license, and if that did happen, it occurred only once. | Defendant had received copies of falsified driver's licenses from Anderson on multiple occasions. |
| 4 | Defendant did not know why Anderson had to pay Defendant more money after | Defendant knew that he had sought additional payments from Anderson |

16

| | | Defendant was contacted by the Federal Bureau of Investigation in January 2019. | after the Federal Bureau of Investigation contact due to the risk associated with their illegal activity. |
|---|---|---|---|
| | 5 | Before Defendant was contacted by the Federal Bureau of Investigation in January 2019, there was nothing that indicated that Anderson was doing anything wrong. | Before January 2019, Defendant knew of many facts that indicated that the shipments Anderson was having Defendant and the Drivers handle were illegal. |

All in violation of Title 18, United States Code, Section 1001(a)(2).

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.